**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

BATINA ADKINS, Individually,
and as Next Friend and Guardian of
DRAVEN ROBERTSON,

Plaintiffs,

v. CIVIL ACTION NO. 3:12-0076

THE UNITED STATES OF AMERICA,

Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff's Motion to Increase Administrative Claim (ECF No. 53). For the reasons explained below, this Motion is **GRANTED**.

## I. Statement of Facts

On January 17, 2012, Plaintiff Batina Adkins filed the pending Complaint individually and as next friend and guardian of her minor son, Draven Robertson, alleging that certain health care providers were negligent in providing prenatal care while Ms. Adkins was pregnant with Draven. Compl., ECF No. 1. As is required by the ("FTCA"),[1] Ms. Adkins filed an

[1] *See* 28 U.S.C. 2675(a): "An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any

administrative claim with the U.S. Department of Health and Human Services, seeking damages of $6,300,000.00, prior to commencing the pending litigation. Claim for Damage, Injury, or Death, Nov. 29, 2010, Ex. A, ECF No. 69-1. This claim was denied on July 28, 2011. Letter to Paul K. Reese from William A. Biglow, July 28, 2011, Ex. C, ECF No. 69-1. As will be discussed more fully below, the amount of damages sought in the administrative claim is generally the maximum amount of damages that a plaintiff can later receive in federal court related to that claim. 28 U.S.C. § 2675(b). Plaintiff now moves to increase the amount of damages she may seek in this case from $6,300,000 to $21,927,334. Mot. Incr. Claim, ECF No. 53. Defendant opposes the motion. The Motion is now ripe for resolution. Section II discusses the legal standard applicable to Plaintiff's Motion and Section III applies that standard to this case.

## II. Legal Standard

Before filing an action in federal court pursuant to the FTCA, the plaintiff must first have presented the claim to the appropriate federal agency. 28 U.S.C. § 2675(a). The subsequent federal case "shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." *Id.* § 2675(b). A plaintiff has the burden of proving that he or she meets this exception. *Kielwien v. United States*, 540 F.2d 676, 680 (4th Cir. 1976).

"To recover damages in excess of their administrative claim . . . , plaintiffs must show

---

time thereafter, be deemed a final denial of the claim for purposes of this section."

that [the injured individual's] prognosis and future disability could not have been discovered prior to" the filing[2] of the administrative claim. *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990). Post-filing information that is merely "cumulative and confirmatory" of earlier evidence does not satisfy this exception. *Kielwien*, 540 F.2d at 680. In *Spivey v. United States*, the district court below had granted an award to the claimant in excess of the amount demanded in her amended administrative claim—filed in January 1987—based on injuries sustained in an automobile accident. This award was based in part on her development of tardive dyskinesia after her amended administrative claim was filed. The Fourth Circuit explained that:

> Tardive dyskinesia is a known possible side effect of the medications which Mrs. Spivey began taking in the fall of 1985. However, prior to August 1987, Mrs. Spivey exhibited no symptoms of that side effect. Therefore, we affirm the court's finding that the occurrence of this side effect, after the administrative claim was submitted, was "newly discovered" evidence within the meaning of § 2675(b).

912 F.2d at 86. This case shows that when determining if § 2675(b) is met, the Court should focus on when the claimant first develops symptoms of his or her condition, not when there is the first possibility that the condition could arise.

The District Court for the Eastern District of Virginia applied *Spivey* in *Murphy v. United States*, 833 F. Supp. 1199 (E.D. Va. 1993). *Murphy* noted the circuit split in what qualifies as "newly discovered evidence" or "intervening facts," and in the end applied the Fourth Circuit's approach as explained in *Spivey*, which is "more favorable to the injured party" than the test used

---

[2] At least one district court case within the Fourth Circuit has held that the operative date for this analysis is the date on which the administrative claim was denied, not the date on which the claim was filed. *See Creech v. United States*, No. 7:06 CV 00279, 2007 WL 853768, at *2 (W.D. Va. Mar. 16, 2007) ("Plaintiff's administrative claim was denied on April 27, 2006; therefore, plaintiff had up until that date to modify her damages claim."). However, the Court will instead focus on what information was known as of the date the claim was filed, consistent with *Spivey*. *See also Murphy v. United States*, 833 F. Supp. 1199 (E.D. Va. 1993) (using the date of filing as the operative date).

in other circuits. *Murphy*, 833 F. Supp. at 1203-04 & n.4. In *Murphy*, the claimant experienced seizures prior to filing her administrative claim, but did not know that the recurrence of seizures would be a permanent condition for the remainder of her life until after the administrative claim was filed. The district court found that this justified an award above the amount in her administrative claim.

The court in *Murphy* cites *Michels v. United States*, 815 F. Supp. 1244 (S.D. Iowa 1993), for its "excellent summary" of the circuit split. *Murphy*, 833 F. Supp at 1203 n.4. The Court finds *Michels*'s discussion of the circuit split instructive here as well. First, "[u]nder the approach adopted by the Eleventh Circuit, a claim may be increased when the claimant either did not know or reasonably could not have known the severity of the injury at the time the FTCA tort claim notice was filed." *Michels*, 815 F. Supp. at 1261. *See also id.* at 1260-61 (discussing this approach in more detail). The Fourth Circuit's *Spivey* decision is cited in *Michels* as falling into this first group. *Id.* at 1261. Second, "under the approach adopted by the First Circuit, a claimant may not amend his or her claim for higher damages unless the claimant has new information which was not reasonably discoverable at the time the FTCA tort claim notice was filed and such information does not go to the severity of claimant's known injuries." *Id.* at 1262. *See also id.* at 1261-62 (discussing this approach in more detail). This "worst case scenario" approach requires that the claimant "assert all [of] his or her claims for damages, no matter how remote or distant the possibility that those damage claims will come to fruition, or run the risk that he or she will be barred from asserting them in a subsequent FTCA action," *id.* at 1263, provided he or she was on notice of the possibility of that scenario, *id.*at 1262 (citation omitted).

In *Lopatina v. United States*, No. CBD-09-2852, 2011 WL 6217036 (D. Md. Dec. 13,

2011), the plaintiff underwent surgery after her administrative claim was filed; based on this surgery, her doctor corrected the diagnoses of her injuries. The district court found that this constituted "newly discovered evidence," explaining that "[a]lthough Plaintiff was aware before her administrative claim was decided that she might have to undergo surgery, she was not aware of the actual causes of her pain until after her claim was decided and she underwent the surgery and post-surgery treatment over the next years." *Id.* at 4. *Compare with Kielwien*, 540 F.2d at 680.[3]

## III. Application

Plaintiff claims that she should be allowed to increase the amount of damages sought pursuant to the exception in § 2675(b) because "newly discovered evidence has come to light after the filing of the Administrative Claim, which was not nor could it have been reasonably discoverable at the time of the original filing of the Administrative Claim." Mem. Supp. Mot. 1, ECF No. 54. Defendant argues, however, that this supposedly-new evidence is merely "cumulative and confirmatory" of information which Plaintiff knew when the administrative claim was filed.

Close examination of the medical records here is crucial in determining whether Plaintiff's request to increase the amount of possible damages satisfies the test of § 2675(b). First, the Court considers the evidence available up to the point when the administrative claim

[3] "[The plaintiff] was told by Drs. Feller, Baird, Herring, Barone and Martin all before she filed her claim that she had a permanent disability, that she was paralyzed and that there was no form of surgery that, in the words of Dr. Martin, offered 'a very practical procedure' in an attempt to relieve even partially her disability. Dr. Wilson's and Dr. Brown's opinions [that neck or muscle surgery would not help her] were merely confirmation of what plaintiff had already been told, not once but repeatedly by other physicians and surgeons, including one privately employed, before she filed her claim." *Kielwien*, 540 F.2d at 680.

was filed on November 29, 2010. Draven was born on October 21, 2008. Upon Draven's discharge from the hospital after birth, his mother knew that he had experienced a stroke based on a blood antibody problem and that he might have a hearing problem. Dep. Batina Adkins 53, 57, 60, Oct. 4, 2012, Ex. 1, ECF No. 53-1. The formal diagnoses of what he experienced at birth were bilateral basal ganglia infarction and germinal matrix hemorrhages caused from being "anti Kell and anti little C antibodies." Letter from Dr. Mitzi Payne, Jan. 6, 2010, U.S. Disclosures at 268, Ex. 2, ECF No. 53-1 at 7. He also suffered from direct hyperbilirubinemia. Letter from Dr. Payne, Apr. 8, 2009, Ex. 2, ECF No. 53-1 at 12.

Dr. Yoram Elitsur examined Draven on December 1, 2008, and noted that Draven was "[i]mproving with time." Ex. 2, ECF No. 53-1 at 15. Draven underwent an evaluation with West Virginia's Birth To Three program on December 22, 2008, which noted that he was previously diagnosed with multifocal and basal ganglia infarcts and that his mother was concerned about what delays he may experience as a result of brain bleeds at birth. Ex. 3, ECF No. 53-1. The evaluation found that Draven was "progressing well in development but there is some atypical development in the area of communication. He is also at risk for developmental delays due to the cerebral infarcts." *Id.* It also noted that referral to a neurologist would be helpful to assess the impact of the infarcts. *Id.*

Dr. Manimekalai Veeraswamy noted on April 7, 2009 (when Draven was approximately 4.5 months old), that Draven was experiencing possible seizure activity and acute breathing problems. U.S. Disclosures at 216, Ex. 2, ECF No. 53-1 at 5. Dr. Mitzi Payne, a pediatric neurologist, examined Draven on April 8, 2009, noting that Draven had had no seizure episode since February 2009 (but nonetheless requested an EEG) and that Draven's "development is

overall appropriate for his age." Letter from Dr. Payne, Apr. 8, 2009, U.S. Disclosures at 288, Ex. 2, ECF No. 53-1 at 12. The Bayley Infant Neurodevelopmental Screener administered that day found that Draven was "[a]ppropriate for [his] corrected age in general" and "[a]ppears low risk [for developmental delay or neurological impairment] at this time." Ex. 5, ECF No. 53-1 at 19. In a follow-up appointment with Dr. Payne on July 29, 2009 (at nine months old), she noted that Draven's "development has been consistently a low risk category" and he was "doing very well." Letter from Dr. Payne, U.S. Disclosures at 278, Ex. 2, ECF No. 53-1 at 10.

A developmental assessment on November 25, 2009 (thirteen months old), noted that Draven used be able to say "bye bye" but no longer did so and that "[h]is mother feels that he doesn't use as many words [as] he should." Ex. 8, ECF No. 53-1. The evaluation found, however, that in light of his overall behavior, he did not meet the eligibility requirements for participation in the Birth To Three program. *Id.* On January 6, 2010, Dr. Payne noted, "Draven has done very well with his development," but found that his score on the Bayley Infant Neurodevelopmental Screener now placed him at moderate risk for developmental delay or neurological impairment. Letter from Dr. Payne, U.S. Disclosures at 268, Ex. 2, ECF No. 53-1 at 7.

A speech-language evaluation on July 15, 2010, showed concerns with Draven's cognitive development, physical development, communication skills, adaptive skills, and social/emotional development. Ex. 10, ECF No. 53-1. Although he was 21 months old at the time, his communication was that of a nine-month old. The report found that he was "at risk" for delays. Another Birth To Three evaluation took place on August 2, 2010. Ex. 11, ECF No. 53-1. This evaluation noted that Draven had been in the Birth To Three program for a few months

when he was younger, but that his mother subsequently took him out of the program because he was doing well. Lately, however, there had been communication and behavior problems, such as a regression in the amount of words he would use and increasingly violent and self-abusive behavior. The evaluation found that he had "atypical development in all areas of development" but that a "[p]sychological evaluation would be helpful for possible diagnosis or strategies for mom to use with behaviors." *Id.*

The above information comprises what Plaintiff knew before filing her administrative claim on November 29, 2010. In summary, Plaintiff knew shortly after Draven's birth that he had experienced infarcts and that there was a possibility of developmental delays. He appeared to be doing well developmentally during approximately the first year of his life. Around November 2009, concerns about his communication skills arose, but were not deemed such a concern that he should be placed back in the Birth To Three program at that point. In January 2010, his risk for developmental delay or neurological impairment increased from low to moderate. In July 2010 he was deemed to be "at risk" for delays, but no diagnosis was given. The August 2010 Birth To Three evaluation noted increasingly worrisome problems with Draven, but again did not provide a diagnosis.

Draven underwent a psychological evaluation on December 8, 2010, which found that his behaviors were consistent with being within the "severe range of Autism." Ex. 12, ECF No. 53-1. The evaluation found that "at this time a diagnosis of Autistic Disorder is indicated." *Id.* It also found that "[t]he overall prognosis is 'good' for improved adaptive, cognitive behavioral and communication skills with continued training, therapies and support." *Id.* An evaluation at Cincinnati Children's Hospital on April 19, 2011, found that Draven had a "significant language

disorder characterized by a severe impairment in Auditory Comprehension and Expressive Communication." Ex. 13, ECF No. 53-1. His "deficits in use of language and social interaction skills appeared to be pervasive in nature, however, due to Draven's young age and significant difficulties regulating his behavior it will be important to monitor his development." *Id.* The evaluation cautioned that "[i]t will be important to consider the outcomes of this assessment in combination with other assessments and reported information when making a medical diagnosis." *Id.* Another evaluation at Cincinnati Children's Hospital on September 6, 2011, formally diagnosed Draven with Global Developmental Delay and Neonatal Stroke. Ex. 14, ECF No. 53-1. The evaluation notes that this delay was caused by the issues surrounding his birth and that he was not in fact "demonstrating classic features of autism"; rather, "his autistic[-]like features will probably diminish" with age. *Id.*

In support of her Motion, Plaintiff submits an affidavit from Dr. Michael E. Msall. Aff. Michael E. Msall, Sept. 10, 2013, Ex. 16, ECF No. 53-1. This affidavit explains at length the timeline of Draven's medical care and the knowledge known by each medical provider along the way. Dr. Msall states that:

> While Draven Robertson evidenced certain health, neurodevelopmental, cognitive, communicative, adaptive, and behavioral problems and deficiencies during the first two years of his life, it was not until December 2010 that the physicians and other medical practitioners providing him services attempted to conduct the necessary testing in order to accurately determine the nature and extent of the injuries he received and what his future prognosis would be. Until this was accomplished, the treatment he would need in the future was not reasonably discoverable.

Msall Aff. ¶ 4. Furthermore:

> While as of November 29, 2010, Draven Robertson's mother and his medical providers would have been able to speculate that Draven Robertson would in the future suffer some type of developmental delays and that there would be some

> type of permanency associated with his injuries[,] no attempt had been done at that time to conduct the necessary comprehensive testing to determine the nature, extent, and severity of his impairments and what future care he might reasonably need.

*Id.* ¶ 10. *See also* ¶ 13 ("It is likewise my opinion to a reasonable degree of medical certainty, that on November 29, 2010, when Batina Adkins filed a claim on behalf of herself and her infant son Draven Robertson with the United States Department of Health and Human Services, neither Batina Adkins, her counsel, or Draven Robertson's medical providers would have been able to determine what his [sic] ongoing health, rehabilitational, behavioral, developmental, community, vocational, and family support services would be needed or the costs thereof. Such information was not reasonably discoverable at the time the claim was filed.").

Based on the evidence presented, the Court finds that the information submitted by Plaintiff falls into § 2675(b)'s exception as "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency." In reaching this decision, the Court uses the standard applicable in the Fourth Circuit—which is more favorable to claimants—rather than the stricter test used in other circuits. When Draven was born, it was known that he had experienced a stroke and would have some sort of permanent injury. At least within the first year, it appeared that the worst fears about the impacts of his stroke were not materializing. Indeed, his development was noted to be fine. As time progressed after that, however, medical records noted increasing problems with Draven, including communication and behavioral concerns, but made no formal diagnoses. After the administrative claim was filed in November 2010, evaluation of Draven continued, and he was finally given a diagnosis of Global Developmental Delay.

The Court draws a parallel between Draven's timeline of medical evaluation and that in

*Spivey*. In *Spivey*, the plaintiff began taking a drug before filing her administrative claim which was known to cause tardive dyskinesia as a possible side effect; she did not develop any symptoms of tardive dyskinesia until after her claim was filed, and the court found that her development of tardive dyskinesia was "newly discovered" evidence. Like in *Spivey*, Plaintiff knew since Draven's birth that severe and permanent developmental disabilities were a possibility. As the time drew closer to the filing of the claim, Draven began to experience more troubling behavior. It was not until after the administrative claim was filed, however, that medical personnel established concretely that Draven would have such significant, permanent disabilities. A parallel can also be drawn to *Murphy*, in that Draven's parents—like the claimant in *Murphy*—did not know that the severity of Drave's condition was permanent until after the claim was filed. The diagnoses provided after the claim was filed were not merely "cumulative and confirmatory," but rather were a departure from what Plaintiff had been told earlier. This is especially true given the challenges of diagnosing such a young child.

Defendant cites many cases from other Circuits, but the Court finds those cases distinguishable. For example, in *Low v. United States*, 795 F.2d 466 (5th Cir. 1986), the Fifth Circuit found that the claimant was not justified in receiving in award above the amount sought in the administrative claim. The Court of Appeals noted that:

> The evidence that the district court concluded was undiscoverable at the time the claim was filed addresses the precision with which the severity of Brian's condition could be known. The evidence does not alter the fact, however, that when the administrative claim was filed Mrs. Low already knew that Brian had cerebral palsy, a seizure disorder, and was blind, deaf, and mentally retarded. There is no evidence that these conditions became worse or that other conditions developed after the claim was filed. Nor do we find any evidence to suggest that before the claim was filed Mrs. Low had reason to think that Brian would not live to be an adult. This is not a case in which the claimant did not know or reasonably could not have known the basic severity of Brian's handicap: it was indubitably of

> grave severity and of unknown—perhaps permanent—duration. The evidence that the district court relied on and that to which Mrs. Low points bears on the precision of Brian's prognosis. . . . Such matters are of their nature dubious, partaking of the uncertainties of life itself in which unexpected deaths and equally unexpected recoveries occur. *It cannot be gainsaid, however, that by the time her claim was filed, Mrs. Low knew that the worst-case prognosis for Brian was one of great severity*.

*Id.* at 471 (emphasis added). *Low* utilizes a worst-case scenario test, which this Court declines to apply in the instant case. *Lebron v. United States*, 279 F.3d 321 (5th Cir. 2002), similarly uses a worst-case scenario test to prohibit increased damages for a child who suffered injuries at birth. *See also Dickerson ex rel. Dickerson v. United States*, 280 F.3d 470 (5th Cir. 2002) (using worst case scenario test); *Reilly v. United States*, 863 F.2d 149 (1st Cir. 1988) (same). In fact, Defendant cites no Fourth Circuit cases which support the analysis that Defendant seeks.[4]

## IV. Conclusion

For the reasons explained above, Plaintiff's Motion to Increase Administrative Claim (ECF No. 53) is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: January 2, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE

[4] It is worth noting, however, that if a worst-case scenario test applied, the Court would not be inclined to find that Plaintiff can seek damages in excess of the amount stated in the administrative claim.